IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| WALTER RUSS, | ) | Case No. 1:20-cv-1838 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | THOMAS M. PARKER |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER**[1] |
| Defendant. | ) | |

Plaintiff, Walter Russ, seeks judicial review of the final decision of the Commissioner of Social Security, denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act.  Russ challenges the ALJ's negative findings, contending that the administrative law judge ("ALJ") misevaluated the opinions of his treating physicians – Juan Solis, MD, and Geetha Mohan, MD.  Because the ALJ failed to apply proper legal standards by inadequately explaining his reasons for finding Russ's treating source opinions unpersuasive, the Commissioner's final decision denying Russ's application for DIB must be vacated and Russ's case must be remanded for further consideration.

## I.    Procedural History

Russ applied for DIB on June 20, 2018.  (Tr. 161).[2]  Russ alleged that he became disabled on March 1, 2018, due to: "1. cardiomyopathy; 2. hyperglycemia; 3. hypertension;

_____

[1] This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and the parties consented to my jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  ECF Doc. 14.

[2] The administrative transcript appears in ECF Doc. 12.

4. hyperthyroidism; 5. back problems; [and] 6. depression." (Tr. 161, 198).  The Social Security

Administration denied Russ's application initially and upon reconsideration.  (Tr. 64-81, 83-

100).  Russ requested an administrative hearing.  (Tr. 113-14).

ALJ Peter Beekman heard Russ's case on September 10, 2019 and denied the claim in an

October 31, 2019 decision.  (Tr. 15-32, 37-63).  In doing so, the ALJ determined that Russ had

the residual functional capacity ("RFC") to perform light work, except that:

> [Russ] can occasionally lift and carry 20 pounds and frequently lift and carry 10
> pounds.  He can stand or walk for 4 hours of an 8-hour workday.  He can sit for 6
> hours of an 8-hour workday.  He can frequently climb ramps and stairs.  He can
> never climb ladders, ropes or scaffolds.  He can constantly balance.  He can
> frequently stoop, kneel, crouch or crawl.  He can constantly perform
> manipulative, visual and communication activities.  He should avoid high
> concentrations of vibrations, smoke, fumes and pulmonary irritants.  He should
> avoid all exposure to workplace hazards.  He can perform simple routine tasks in
> a low stress environment with no high production quotas or piece rate work.

(Tr. 21).  Based on the vocational expert ("VE") testimony that an individual with his age,

experience, and RFC could work in such representative occupations as cashier II, mail clerk, or

lens grander, the ALJ determined that Russ wasn't disabled because he could perform a

significant number of jobs in the national economy.  (Tr. 31-32).  On July 20, 2020, the Appeals

Council denied further review, rendering the ALJ's decision the final decision of the

Commissioner.  (Tr. 1-3).  And on August 18, 2020, Russ filed a complaint to obtain judicial

review.  ECF Doc. 1.

## II.    Evidence

### A.      Personal, Educational, and Vocational Evidence

Russ was born on May 11, 1969, and he was 48 years old on the alleged onset date.  (Tr.

64, 161).  He completed high school in 1988.  (Tr. 199).  He had experience as a cook, food

deliveryman, auto detailer, and vending attendant, but the ALJ determined that he was unable to perform that work.  (Tr. 30, 40-41, 199, 265-66).

    **B.**    **Objective Medical Evidence**

    On March 16, 2017, Russ began receiving primary care treatment from Juan Solis, MD. (Tr. 604).  Russ presented with generalized fatigue and fragmented sleep.  *Id.*  Russ's physical examination was normal except that he was obese and mildly dysthymic.  (Tr. 605-06). Dr. Solis noted that Russ had a history of hypertension, and Russ's EKG came back with T-wave inversions anterolaterally and occasional premature ventricular contractions.  (Tr. 608).  Dr. Solis ordered blood and urinalysis tests and scheduled a follow-up.  (Tr. 606-08).

    Russ returned to Dr. Solis on October 11, 2017.  (Tr. 588).  Russ's father-in-law had died of an overdose and his brother-in-law had hung himself, and it was Russ who discovered his deceased brother-in-law.  *Id.*  Russ still struggled with fragmented sleep/fatigue and asked for a "magic pill" that could give him more energy so he could work and take care of his children.  *Id.* Upon examination, Russ was again dysthymic.  (Tr. 590).  A new EKG revealed more frequent premature ventricular contractions, which Dr. Solis stated might explain why Russ was tired all of the time.  (Tr. 597).  Dr. Solis referred Russ to a cardiologist.  *Id.*  Dr. Solis also ordered new blood and urinalysis tests and prescribed paroxetine to treat his mood and lack of energy.  (Tr. 595-97).

    On November 1, 2017, Russ visited Dr. Solis to discuss his test results.  (Tr. 574).  Russ reported that he was "tired all the time" and wanted a "potion that can give me my energy back." *Id.*  He denied any depression and stated he was sleeping well.  *Id.*  His physical examination results were normal, except he appeared dysthymic.  (Tr. 576).  Dr. Solis explained to Russ that

his lab results were "largely unremarkable, they do not explain why you are so tired."  (Tr. 581).

He did, however, have slightly elevated cholesterol.  *Id.*  Dr. Solis noted dyspnea on exertion.  *Id.*

On December 27, 2017, Russ visited cardiologist Geetha Mohan, MD.  (Tr. 485).  Russ

reported exertional shortness of breath and chest discomfort.  *Id.*  He had a cardiac catherization

in 2011, which showed angiographically normal coronary arteries but elevated left ventricular

end-diastolic pressure.  *Id.*  However, he recently had an abnormal ECG, and an echocardiogram

showed moderately increased left ventricular posterior wall thickness.  *Id.*  Dr. Mohan

determined that Russ had: (1) exertional shortness of breath, functional class III; (2) elevated left

ventricular end-diastolic pressure suggesting diastolic dysfunction, based on the 2011 cardiac

catherization; (3) obstructive sleep apnea; (4) clinical depression, based on the paroxetine

prescription; (5) obesity; and (6) family-history based risk of premature coronary artery disease.

*Id.*  Dr. Mohan ordered a treadmill stress test and a cardiac MRI.  (Tr. 485, 487).

On December 29, 2017, Russ returned to Dr. Solis for a follow up, reporting that

Dr. Mohan had recommended he restart using his CPAP machine.  (Tr. 568).  He previously had

been prescribed one, but he had not tolerated using it.  *Id.*  Russ reported that for the past week

he had modest dyspnea on exertion, coughing, and chest congestion, as well as generalized

fatigue.  *Id.*  Dr. Solis noted that Russ was acutely ill and diagnosed him with acute bronchitis

and dehydration, and placed Russ on antibiotics.  (Tr. 571-72).  Otherwise, Dr. Solis stated that

Russ was "hemodynamically stable."  (Tr. 572).

On January 15, 2018, Russ underwent a cardiac MRI, which showed: (1) hypertrophic

cardiomyopathy; (2) confluent hyperenhancement/fibrosis of the basal, mild, and distal anterior

and inferior ventricular junctions; (3) left ventricular hypertrophy; (4) left-right atrial

enlargement; (5) mild-to-moderate mitral valve regurgitation; and (6) mild tricuspid valve regurgitation.  (Tr. 424-25).

On January 31, 2018, Russ visited Dr. Mohan to follow up on his MRI, reporting continued exertional shortness of breath.  (Tr. 473).  Upon review of the MRI results, Dr. Mohan stated that there was no mentioned increased risk of sudden cardiac death.  *Id.*  And Russ's "exertional shortness of breath is most likely related to diastolic heart failure."  *Id.*  Dr. Mohan stated that treatment with diuretics might help.  *Id.*  In an addendum to her January 31, 2018 treatment notes, Dr. Mohan noted that she consulted with another physician.  *Id*.  Dr. Mohan stated that Russ's exertional shortness of breath can be explained "on the basis of diastolic dysfunction and increased LVEDP."  (Tr. 474).

On February 7, 2018, Russ underwent an exercise stress echocardiogram.  (Tr. 395).  The examiner – Theodore Pacheco, MD – noted that Russ's functional capacity was below average. *Id.*  Russ developed leg fatigue and Achilles tendon pain during the exam, both of which resolved with rest.  *Id.*  He was able to tolerate eight minutes and ten seconds of exercise until he terminated the test due to his symptoms.  *Id.*  Pacheco noted normal left ventricular systolic function, no exercise induced wall motion abnormalities, and no evidence of significant LVOT obstruction.  (Tr. 397).

On February 9, 2018, Russ returned to Dr. Solis, reporting debility, myalgia, and arthralgia, especially when he woke up in the morning.  (Tr. 561).  His physical exam was normal.  (Tr. 564).  Dr. Solis reviewed Russ's MRI results, explained the significance of the results to Russ, ordered new blood and urinalysis tests, and continued medication.  (Tr. 564-66). Dr. Solis also prescribed prednisone to address Russ's symptoms.  (Tr. 565).

On February 18, 2018, Russ received a cardiac telemetry unit to record his cardiac events.  (Tr. 471).  On March 1, 2018, Russ visited electrophysiologist Alberto Diaz, MD, for a consultation at the request of Dr. Mohan.  (Tr. 466).  Since placement of the cardiac telemetry unit, Russ reported frequent episodes of ventricular tachycardia.  *Id.*  His breathing had improved, but he was still short of breath with activities.  *Id.*  Russ reported no syncopal episode but did report pre-cardiac telemetry unit episodes of dizziness and coming close to passing out. *Id.*  Dr. Diaz's clinical impression was: (1) shortness of breath, "most likely diastolic heart failure;" (2) history of delayed enhancement; (3) ventricular tachycardia; (4) history of hypertrophic cardiomyopathy; (5) normal coronary arteries; and (6) normal left ventricular function.  (Tr. 467).  Dr. Diaz recommended a cardioverter-defibrillator ("ICD") implant and referred Russ to Dr. Mohan to manage his shortness of breath.  (Tr. 467, 469).

The ICD was implanted on March 2, 2018, and Russ was discharged from the hospital the next day.  (Tr. 308, 346).  Russ's discharge diagnoses were: (1) status post ICD dual chamber without complications; (2) history of ventricular tachycardia; (3) palpitations; (4) near syncope; (5) hypertrophic cardiomyopathy; and (6) shortness of breath, likely related to diastolic heart failure.  (Tr. 308).  On discharge, Dr. Diaz stated that Russ was doing well and denied symptoms of chest pain and shortness of breath.  *Id.*

Russ's cardiac telemetry unit was terminated on March 6, 2018.  (Tr. 471).  Dr. Mohan noted that the results were "very abnormal," showing very frequent ventricular ectopy and non-sustained ventricular tachycardia.  *Id.*  There were also reported symptoms of lightheadedness, dizziness, and shortness of breath that corresponded to sinus rhythm and sinus bradycardia.  *Id.*

On April 9, 2018, Russ visited Dr. Solis to follow up on his ICD implant.  (Tr. 554).  He reported no palpitations, dizziness, diaphoresis, or dyspnea on exertion.  *Id.*  However, Russ still

reported fatigue.  *Id.*  Physical examination results were normal except Russ appeared mildly

dysthymic/frustrated.  (Tr. 557).  Dr. Solis sated that Russ's fatigue was likely related to his heart

and referred him to physical therapy.  (Tr. 559).  Dr. Solis also prescribed Alprazolam to help

him tolerate his CPAP machine and ordered a sleep study.  *Id.*

On April 24, 2018, Russ underwent an overnight polysomnography.  (Tr. 295).  The

reviewing physician – Harinathrao Dacha, MD – determined that the results were consistent with

severe obstructive sleep apnea, poor sleep efficiency, and mild periodic limb movement disorder.

*Id.*

On May 9, 2018, Russ underwent a graded exercise test ordered by Dr. Mohan.  (Tr. 277-

78).  Russ exercised for seven minutes and eight seconds, during which he did not experience

any chest discomfort.  (Tr. 277).  He only achieved 75% of the maximum predicated heart rate,

and the test was stopped secondary to generalized fatigue.  *Id.*  Dr. Pacheco noted below average

functional aerobic capacity.  *Id.*

On May 18, 2018, Russ presented to Dr. Solis with low back and groin pain.  (Tr. 544).

Dr. Solis noted that Russ appeared a little debilitated but was ambulating without assistance and

still able to work.  *Id.*  His pain appeared to be a result of prolonged standing.  *Id.*  Russ's

physical exam was normal, except tenderness along his inner thigh.  (Tr. 547).  Dr. Solis

determined that Russ's groin pain was likely the result of sacroiliitis and prescribed pain

medication.  (Tr. 548).

On June 6, 2018, Russ visited Dr. Mohan with his wife.  (Tr. 450).  Russ's wife told

Dr. Mohan Russ had "profound fatigue [and] worsening exertional shortness of breath, and that

[Russ] may not be able to continue working."  *Id.*  Russ himself did not report palpitations,

presyncope, or syncope.  *Id.*  Russ's physical exam results were normal.  (Tr. 453).  Dr. Mohan

assessed Russ with fatigue but noted that it was "very difficult to assess." (Tr. 450). Dr. Mohan also determined that Russ had sub-optimally treated obstructive sleep apnea, significant diastolic dysfunction, and elevated end-diastolic pressure, all of which could contribute to his fatigue. *Id.* Dr. Mohan referred Russ to assess the feasibility of nocturnal oxygen or nasal CPAP and cardiac rehabilitation and adjusted his medication. (Tr. 450-51, 453-54).

On July 2, 2018, Russ visited Ashok Makadia, MD. (Tr. 491). Russ reported shortness of breath with exertion, daytime tiredness, and poor sleep. *Id.* His physical examination results were normal. (Tr. 493). Dr. Makadia requested an X-ray and pulmonary function test to evaluate Russ's shortness of breath and would evaluate his obstructive sleep apnea upon receipt of his sleep study. *Id.* On July 6, 2018, Dr. Makadia performed a pulmonary function study. (Tr. 490). The results showed normal spirometry, hyperinflation, normal diffusion capacity, and low airway resistance. *Id.*

On July 18, 2018, Russ returned to Dr. Solis, reporting that he was still tired all the time. (Tr. 532). He felt no appreciable difference after receiving the ICD. *Id.* Russ's physical examination results were normal, except he was minimally dysthymic. (Tr. 535). Dr. Solis noted that Russ was "[f]atigued, frustrated, but stable." (Tr. 542). Dr. Solis ordered laboratory examinations and would reassess upon receipt of the results. *Id.*

On September 19, 2018, Russ visited Dr. Solis, indicating that Dr. Mohan had suggested his depression medication dose be raised. (Tr. 655). Russ stated he felt less depressed and more productive while on Adipex. *Id.* Otherwise, there were no signs of hemodynamic instability. *Id.* Russ reported that in the past he would start things but start doing something else and forget what he was doing in the first place. *Id.* He also reported trouble concentrating and chronic tiredness. *Id.* His physical examination results were normal. (Tr. 658). Dr. Solis referred Russ

8

for neurological evaluation and renewed his medication.  (Tr. 664).  Dr. Solis stated he believed Russ had attention deficit disorder.  *Id.*

On October 1, 2018, Russ underwent a graded exercise test, which showed below average functional aerobic capacity.  (Tr. 682).  The test lasted seven minutes, and Russ only achieved 70% of the maximum predicted heart rate.  *Id.*

On October 26, 2018, Russ visited Sanjay Parikh, MD, for a neurological evaluation. (Tr. 638).  Russ reported having trouble staying focused, as well as depression and anxiety.  *Id.* He also reported trouble sleeping, nightmares, and fear of dying.  *Id.*  His physical and neurological exams were normal except he had flat affect.  (Tr. 638, 641).  Dr. Parikh determined that Russ had depression due to his underlying medical condition.  (Tr. 638).  Dr. Parikh further determined that his attention deficit symptoms could be related to his depression and medical condition.  *Id.*  She requested an EEG and recommended continuing his medication (Lexapro and Wellbutrin).  (Tr. 638, 641-42).  Russ underwent an EEG on November 14, 2018, with normal results.  (Tr. 637).

On November 27, 2018, Russ returned to Dr. Parikh for a follow up.  (Tr. 632).  His physical and neurological exam were normal except for impaired memory and decreased attention span.  (Tr. 632, 635).  She prescribed Tenex.  (Tr. 632).

On December 4, 2018, Russ visited Dr. Mohan.  (Tr. 675).  Russ felt much improved and more alert, but he still reported fatigue and difficulty concentrating.  *Id.*  A review of Russ's ICD revealed no events since June 2018.  *Id.*  Russ's physical examination results were normal.  (Tr. 677).  Dr. Mohan adjusted Russ's medication.  (Tr. 677-78).  Dr. Mohan also noted that Russ's "[u]nrelenting fatigue" had improved since Russ started CPAP and titration of Lexapro.  (Tr. 675).

9

On March 22, 2019, Russ reported to Dr. Solis that he had missed his follow ups because he lost his insurance.  (Tr. 806).  He was "just tired all the time," suffered headaches towards the end of the day, and had some polyarthralgia and polymyalgia.  *Id.*  He was essentially "back to where he was before he got tuned up by cardiology."  *Id.*  He was also dysthymic and had been seeing a psychologist.  *Id.*  Russ also reported generalized weakness.  *Id.*  Russ's physical exam was normal except he was dysthymic and moderately obese.  (Tr. 808-09).  Dr. Solis ordered blood and urinalysis tests and asked that Russ put his psychiatrist and psychologist in touch with Dr. Solis.  (Tr. 811).  Dr. Solis also ordered that Russ re-establish neurology and cardiology treatment and prescribed Alprazolam for his obstructive sleep apnea.  *Id.*

Russ saw Dr. Solis on April 24, 2019 for weight management and Dr. Solis reviewed with him his lab results.  (Tr. 819).  Russ's physical exam results were normal, except he was moderately obese, and Dr. Solis noted he was in better spirits.  (Tr. 822).

Russ returned on May 23, 2019, asking Dr. Solis for a letter stating he could not return to work because of his ICD implant.  (Tr. 827).  Russ reported difficulty maintaining a job because of chronic fatigue, "later thought to be related to cardiomyopathy."  *Id.*  Russ had residual dyspnea on exertion.  *Id.*  His physical examination results were normal except he appeared minimally dysthymic.  (Tr. 830).  Dr. Solis provided a letter and scheduled a follow up.  *Id.*

On June 6, 2019, Russ reported to Dr. Solis.  (Tr. 832).  He was hemodynamically stable and had no particular dyspnea on exertion but continued to have fatigue.  *Id.*  Russ also reported recurrent sciatica on the left side, for which he experienced only "some relief" with tramadol.  *Id.*  His physical exam results were normal.  (Tr. 835).  Dr. Solis referred Russ to a physical therapy evaluation for his sciatica and ordered lab tests.  (Tr. 839-40).

Also on June 6, 2019, Russ reported to Dr. Mohan, reporting tiredness with any activity and that he had discontinued CPAP because his kids broke the machine.  (Tr. 779).  He also had an episode of vasodepressor syncope while shoveling heavy dirt.  *Id.*  He held his breath and passed out momentarily.  *Id.*  Russ's physical examination results were normal.  (Tr. 781). Dr. Mohan ordered that Russ follow up with Dr. Diaz, instructed Russ to get back on CPAP therapy, and resumed his medication.  (Tr. 779, 781-82).

On June 7, 2019, Russ went to the emergency room to have his sciatic pain evaluated. (Tr. 789, 793).  He reported his pain as severe (8/10) and said he had difficulty walking.  (Tr. 789-90).  His physical examination results were normal.  (Tr. 795-96).  Russ was discharged in stable condition.  (Tr. 797).

On June 13, 2019, Russ visited Dr. Diaz, reporting continued tiredness and fatigue while doing daily activities.  (Tr. 785).  Dr. Diaz reviewed the ICD and stated that, from an electrophysiology standpoint, Russ was doing well.  *Id.*  Dr. Diaz noted, however, five episodes of non-sustained ventricular tachycardia.  *Id.*

On August 5, 2019, Russ went to the emergency room for back pain, which he reported as severe (8/10).  (Tr. 845-46, 850).  At the time of examination, he reported his pain as 10/10, worsening with movement and not alleviated with over-the-counter medication.  (Tr. 850).  He was discharged with a diagnosis of acute exacerbation of chronic low back pain after Russ reported feeling much better.  (Tr. 852).

C.      **Relevant Opinion Evidence**

1.      **Treating Physician – Juan Solis, MD**

On April 2, 2019, Dr. Solis prepared a "Medical Source Statement: Physical Abilities and Limitations" regarding Russ.  (Tr. 726).  Dr. Solis opined that Russ: (1) could work 4-6 hours in

11

a typical workday; (2) would likely be absent an average of 3 or more days per month; (3) could stand/walk for 5-10 minutes at one time and for 1 hour with intermittent breaks; (4) had "[n]o difficulty" sitting, but might fall asleep and could sit for 30-60 minutes at one time and for up to 6 hours with intermittent breaks; and (5) could lift/carry 20 pounds occasionally and 5 pounds frequently.  (Tr. 726-27).

Dr. Solis explained that Russ's attendance limitations were due to "[f]atigue, somnolence, depression, [and] inability to concentrate."  (Tr. 726).  And Russ's standing/walking and lifting/carrying limitations were because of "fatigue."  (Tr. 726-27)*.*  With regard to Russ's mental limitations, Dr. Solis stated "[r]eferred to psychiatry for more in-depth evaluation. Referred to Neurology for treatment."  (Tr. 727).

## 2. Treating Physician – Geetha Mohan, MD

On April 13, 2019, Dr. Mohan prepared a "Medical statement regarding cardiomyopathy for Social Security disability claim" regarding Russ.  (Tr. 731-32).  The statement was a form with checked or circled answers.  *Id.*  Dr. Mohan's checked answers indicated that Russ had hypertrophic cardiomyopathy, and Russ's symptoms included: (1) fatigue on exertion; (2) dyspnea on mild exercise; (3) palpitations; and (4) inability to carry on any physical activity. (Tr. 731).  On the margin, Dr. Mohan wrote that Russ had fatigue and difficulty staying awake. *Id.*  Dr. Mohan's circled answers stated that Russ could: (1) work 4-6 hours per day; (2) stand for 2 hours at a time; (3) sit for 4 hours at a time; (4) lift 20 pounds occasionally; and (5) lift 10 pounds frequently.  *Id.*  Dr. Mohan explained that his opinion was purely from a cardiological aspect.  (Tr. 732).

D.       **Russ's Functional Report**

In a July 23, 2018 function report, Russ stated that his mobility and energy levels were limited by weakness, shortness of breath, and leg and foot pain.  (Tr. 207, 214).  He also stated that he was very depressed and had high anxiety, which "is now playing a big role."  (Tr. 207). His daily activities consisted of sitting at home doing small chores, playing with children – which he noted was limited due to pain and his mood – and sleep.  (Tr. 208).  He had chickens and two goats that he took care of with the aid of his wife and kids.  *Id.*  Because of his impairments he could no longer work, play with his kids, have a dog, keep up with yardwork and housework, and walk distances.  *Id.*  He also had trouble sleeping because of sleep apnea, leg/foot pain, and depression.  *Id.*

Russ stated that he couldn't breathe or bend to put on socks.  *Id.*  He had to shower because he could not sit in a tub or get up from a seated position.  *Id.*  He also could not cut his toenails.  *Id.*  He could, however, shave, feed himself, and use the restroom.  *Id.*  Russ's wife dispensed his medication and prepared food.  (Tr. 209).  Russ would at most make a sandwich three times per month.  *Id.*  He did not prepare meals because his feet would hurt from standing long periods of time and he was depressed and didn't want to do much of anything.  *Id.*

Russ stated that he was able to fold laundry, dust, and sweep the kitchen.  *Id.*  It would take him longer than usual because he would get side-tracked and sit down.  *Id.*  He didn't do yardwork because he would get out of breath and his feet hurt.  (Tr. 210).  He would only go outside if it was cool.  *Id.*  Russ could drive and go out alone.  *Id.*  He did his shopping by mail and his family grocery shopped for him.  *Id.*  His hobbies included fishing once in a while and riding a motorcycle, though he didn't "ride much anymore."  (Tr. 211).

Russ mostly stayed at home in his room.  *Id.*  He had issues getting along with neighbors because of his mood and depression.  (Tr. 212).  He could walk short distances, his foot pain inhibited his ability to stand, and his back injury made it hard to sit for extended periods of time.  *Id.*  He could climb stairs, but his joints would hurt, and his ability to complete tasks and concentrate was limited by his depression.  *Id.*  He could walk as far as his driveway before needing to stop and rest and needed a few minutes before continuing.  *Id.*  He could pay attention for up to 20 minutes, but he rarely finished what he started.  *Id.*

### E.    Relevant Testimonial Evidence

Russ testified at the ALJ hearing.  (Tr. 40-58).  Russ said he became disabled on March 1, 2018 because of his heart and the associated fatigue.  (Tr. 41-42).  He was always tired, had no energy, and couldn't concentrate.  (Tr. 42).  Russ believed his fatigue was also associated with his depression.  *Id.*  And his primary care physician and cardiologist also believed his fatigue was related to his heart muscles hardening and restricted blood flow.  (Tr. 53).  He was tired all the time, but not the kind that would cause him to fall asleep.  (Tr. 49).  He did have sleep problems.  *Id.*  He'd sleep from past midnight until 7:00 a.m.  *Id.*  He would lie down in his recliner to relax when he felt exhausted.  (Tr. 49-50).  If he didn't, he would feel "really exhausted and tired."  (Tr. 50).

On a typical day, Russ testified he would get out of bed, go to the bathroom, go downstairs and get something to drink, wake up his kids and have them start getting ready to go to school, send his kids off to school, and do what he could around the house.  (Tr. 43).  If he felt up to hit, Russ might vacuum or do "a couple of dishes."  *Id.*  Russ's children were 3, 4, 6, 16, and 18 years old.  (Tr. 44).  He watched television but not movies because he could never finish

14

them.  *Id.*  He would get distracted.  *Id.*  For his distractibility, he was prescribed guanfacine.  (Tr. 47).

Russ testified that he had dogs that weighed around 30 pounds each.  (Tr. 45).  He did not walk them; his wife and kids mostly took care of them.  *Id.*  Russ could, however, scoop some food out of the food bag for the dogs and open the door to let them outside.  *Id.*  He enjoyed going fishing in his friend's boat.  *Id.*  He had done that maybe three times over the course of a whole summer.  (Tr. 51).  He sometimes went shopping with his wife, but he mostly just chose the food.  (Tr. 46).  His wife and kids carried the groceries, though he could "carry a couple of bags in."  *Id.*  Russ said he used the CPAP machine every day, but not all night because he would get claustrophobic.  (Tr. 47).

## III.    Law & Analysis

### A.    Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).  And, even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "'so long as substantial evidence also supports the conclusion reached by the ALJ.'" *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quoting *Jones*, 336 F.3d at 477); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (Substantial evidence "means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'").  But, even if substantial evidence supported the ALJ's decision, the

15

court will not uphold that decision if the Commissioner failed to apply proper legal standards, unless the legal error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision … will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").  And the court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked.").

### B.      Step Four: Weighing of Opinion Evidence

Russ argues that the ALJ failed to apply proper legal standards or reach a decision supported by substantial evidence in his evaluation of Dr. Solis's and Dr. Mohan's opinions. ECF Doc. 13 at 11-16.  He argues that the ALJ failed to apply proper legal standards by not considering all the factors articulated in 20 C.F.R. § 404.1520c.  ECF Doc. 13 at 15-16.  Russ argues that the ALJ's evaluation of Dr. Solis's opinion was not supported by substantial evidence because there is no indication in the record that Solis based his opinion solely on Russ's subjective complaints.  ECF Doc. 13 at 13-14.  Russ also argues that the ALJ's finding that Dr. Solis's and Dr. Mohan's findings were not persuasive in light of his activities of daily living was not supported by substantial evidence given his testimony and statements regarding how limited he was in his activities of daily living.  ECF Doc. 13 at 14-15.  Russ contends that Dr. Solis's and Dr. Mohan's opinions were consistent with each other and the objective evidence or record.  ECF Doc. 13 at 15-16.  Russ also argues that the ALJ erred in stating that "no treating

physician refers to claimant as having incapacitating or debilitating symptoms that would preclude return to the workplace." ECF Doc. 13 at 16.

The Commissioner responds that the ALJ properly found that Dr. Solis's and Dr. Mohan's opinions were unsupported by the record and unpersuasive. ECF Doc. 15 at 7-10. The Commissioner also argues that he ALJ was not required to discuss all the regulatory factors, only supportability and consistency. ECF Doc. 15 at 9. Last, the Commissioner argues that the ALJ's statement regarding an opinion on Russ's ability to return to the workplace was harmless given the ALJ's analysis of his allegations of disability. ECF Doc. 15 at 9-10.

### 1. Medical Opinion Evaluation Standard

At Step Four of the sequential evaluation process, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. § 404.1520(e). On January 18, 2017, the Social Security Administration amended the rules for evaluating opinion evidence for claims filed on or after March 27, 2017. *See Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844 (Jan. 18, 2017). The new regulations provide that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s)." 20 C.F.R. § 404.1520c(a). Nevertheless, an ALJ must "articulate how [he] considered the medical opinions and prior administrative medical findings" in adjudicating a claim. *Id.* In doing so, the ALJ is required to explain how he considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors. 20 C.F.R. § 404.1520c(b)(2). If the ALJ finds that two or more medical opinions "are both *equally well-supported and consistent* with the record but are not exactly the same," the ALJ must articulate what factors were most persuasive in differentiating the opinions. 20 C.F.R.

§ 404.1520c(b)(3) (internal citations omitted) (emphasis added).  Other factors include: (1) the length, frequency, purpose, extent, and nature of the source's relationship to the client; (2) the source's specialization; and (3) "other factors," such as familiarity with the disability program and other evidence in the record.  20 C.F.R. § 404.1520c(c)(3)-(5).  Consistency concerns the degree to which the opinion reflects the same limitations described in evidence from other sources, whereas supportability concerns the relevancy of objective medical evidence and degree of explanation given by the medical source to support the limitations assessed in the opinion. *See* 20 C.F.R. § 404.1520c(c)(1)-(2).

### 2. Dr. Solis

The ALJ failed to apply proper legal standards in his evaluation of Dr. Solis's opinion. 42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  Although Russ faults the ALJ for not analyzing *all* of the regulatory factors, the ALJ wasn't required to.  The only regulatory factors for which the ALJ was required to give an explanation were supportability and consistency.  *See* 20 C.F.R. § 404.1520c(b)(2).  The ALJ certainly considered supportability when the ALJ explained that it appeared that Dr. Solis's opinion was based on Russ's subjective complaints.  20 C.F.R. § 1520c(c)(1); (Tr. 28).  And the ALJ's statement that Russ could "prepare meals, shop, drive, handle self-care and personal hygiene, care for pets and care for his children" implied a finding that the limitations Dr. Solis ascribed to Russ were not consistent with Russ's activities of daily living.  20 C.F.R. § 1520c(c)(2); (Tr. 28).

But the ALJ also was required to give a "coherent explanation for his reasoning" sufficient to allow us to understand how the ALJ arrived at his conclusion and conduct meaningful judicial review.  *Lester v. Saul*, No. 5:20-cv-01364, 2020 U.S. Dist. LEXIS 247187, at *40 (N.D. Ohio Dec. 11, 2020); *Fleischer*, 774 F. Supp. 2d at 877; *see also Scott v. Barnhart*,

297 F.3d 589, 595 (7th Cir. 2002).  This is where the ALJ's decision falls short.  The ALJ
reasoned that Dr. Solis's opinion appeared based on Russ's subjective complaints, but the ALJ
did not explain how he arrived at that conclusion.  *See* (Tr. 28).  Nor did the ALJ explain why
Russ's activities of daily living were inconsistent with the limitations attributed to Russ by
Dr. Solis.  *See id.*

Further, the activities of daily living the ALJ cited did not directly undermine Dr. Solis's
opinion.  Russ testified that his wife prepared his meals, and he would at most make a sandwich
three times a month.  (Tr. 209).  It's unclear how Russ's ability to make a sandwich leads to the
conclusion that he can stand for more than five to ten minutes at a time for up to one hour.  Russ
did testify that he sometimes went grocery shopping with his wife, but his involvement was
limited to choosing the food and his wife and children mostly carried the bags.  (Tr. 46, 210).
The fact that Russ can drive isn't particularly telling of how long Russ can sit, walk, stand, or
lift.  (Tr. 210).  Nor is his ability to handle "self-care and personal hygiene."  (Tr. 28).  And his
ability to care for pets consisted of scooping food from a food bag opening the door, and caring
for his children consisted of waking them up to go to school.  (Tr. 43, 45).  It may well be that
Russ's activities of daily living were inconsistent with Dr. Solis's opinion, but the ALJ had to
explain in what way those activities were inconsistent with Dr. Solis's opinion.

The ALJ's explanation failed to build an accurate and logical bridge between the
evidence and his conclusion that Dr. Solis's opinion was based on Russ's subjective complaints
and inconsistent with his activities of daily living.  *Fleischer*, 774 F. Supp. 2d at 877.  The error
was not harmless because, without fuller explanation, we cannot engage in meaningful review of
the ALJ's decision.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009).  The
fact that the ALJ's ultimate conclusion may be supported by substantial evidence isn't enough.

*See id.* at 410 (stating that substantial evidence is no excuse to non-compliance with 20 C.F.R. § 404.1527(d)(2)).  Although the ALJ correctly noted that part of Dr. Solis's opinion – that Russ was limited to working four to six hours – was a matter reserved for the Commissioner, the other parts of Dr. Solis's opinion could not be discounted solely on that basis.  20 C.F.R. § 1520b(c)(3)(i).  And the ALJ never mentioned Dr. Solis's finding that Russ would be absent from work more than three days per month.  This was not harmless given the VE's testimony that an individual could be off-task no more than 15% of the time and still sustain employment. *See Fleischer*, 774 F. Supp. 2d at 880 (the ALJ "may not ignore evidence that does not support his decision"); SSR 96-8p, 1996 SSR LEXIS 5, at *20 (July 2, 1996) ("If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."); (Tr. 28, 61, 726).

### 3.    Dr. Mahon

The ALJ similarly failed to apply proper legal standards in his evaluation of Dr. Mohan's opinion.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  The ALJ's reasons for finding Dr. Mohan's opinion unpersuasive were: (1) that it "supports the light exertional residual functional capacity;" (2) its standing and sitting limitations were not "support[ed] by a preponderance of the evidence;" (3) Russ could prepare meals, shop, drive, handle self-care and personal hygiene, care for pets, and care for his children; and (4) its opinion that Russ could only work four to six hours was an issue reserved for the Commissioner.  (Tr. 29).

Absent from the ALJ's evaluation of Dr. Mohan's opinion is any discussion on the supportability of Dr. Mohan's opinion.  20 C.F.R. § 404.1520c(b)(2).  Although the ALJ stated that the opinion was unsupported by a "preponderance of the evidence," that finding relates to the consistency of the opinion with the evidence in the record not whether the opinion itself cited

"relevant … objective evidence and supporting explanations." 20 C.F.R. § 404.1520c(c)(1). That consistency finding, too is problematic, because it contains no explanation of in what way Dr. Mohan's opinion was inconsistent with the record evidence. 20 C.F.R. § 404.1520c(b)(2). Although the ALJ implicitly found that Dr. Mohan's opinion was inconsistent with Russ's activities of daily living, as with the ALJ's evaluation of Dr. Solis's opinion, it is unclear how the cited activities of daily living undermined Dr. Mohan's opinion that Russ could only stand for two hours and sit for four hours.  (Tr. 731).

        In addition, the ALJ's first reason is puzzling.  Dr. Mohan's opinion that Russ could occasionally lift 20 pounds and frequently lift 10 pounds *is* consistent with an RFC to perform light work. 20 C.F.R. § 404.1567(b).  But light work also requires a "good deal of walking or standing, or … sitting most of the time with some pushing and pulling of arm or leg controls." *Id.*  Specifically, "the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday."  SSR 83-10, 1983 SSR LEXIS 30, at *14 (1983).  Dr. Mohan opined that Russ could stand for two hours and sit for four hours at one time. (Tr. 731).  If the ALJ meant that Dr. Mohan's opinion supported a finding that Russ could perform a full range of light work, such a finding would be inaccurate.  And the ALJ's final reason only undermined Dr. Mohan's opinion regarding how many hours Russ could work, but not how long he could stand or sit.  20 C.F.R. § 1520b(c)(3)(i); (Tr. 731)

        In short, with Dr. Mohan's opinion too, the ALJ gave inadequate explanation to allow us to make a meaningful review of his decision.  *Blakley*, 581 F.3d at 409.  And it failed to build an accurate and logical bridge between the evidence and the result.  *Fleischer*, 774 F. Supp. 2d at 877.

**IV.    Conclusion**

Because the ALJ failed to apply proper legal standards in explaining why he found unpersuasive Dr. Solis's and Dr. Mohan's opinions, the Commissioner's final decision denying Russ's application for DIB is VACATED and Russ's case is REMANDED for further consideration.

**IT IS SO ORDERED.**

Dated: August 20, 2021

Thomas M. Parker
United States Magistrate Judge